1   WILLIAM S. LERACH (68581)
    ALAN SCHULMAN (128661)
2   MILBERG WEISS BERSHAD
       HYNES & LERACH
3   600 West Broadway, Suite 1800
    San Diego, CA  92101
4   Telephone:  619/231-1058
          - and -
5   JEFF S. WESTERMAN (94559)
    MILBERG WEISS BERSHAD
6      HYNES & LERACH
    355 South Grand Avenue
7   Suite 4170
    Los Angeles, CA  90071
8   Telephone:  213/617-9007

9   JOSEPH H. WEISS                 ROBERT SUSSER
    LAW OFFICES OF JOSEPH H.        STULL, STULL & BRODY
10     WEISS                        6 East 45th Street
    319 Fifth Avenue                4th Floor
11  New York, NY  10016             New York, NY  10017
    Telephone:  212/532-4171        Telephone:  212/687-7230
12
    Attorneys for Plaintiff
13

14                 UNITED STATES DISTRICT COURT

15                 CENTRAL DISTRICT OF CALIFORNIA

16

17  DAVID GROSS, On Behalf of Himself   ) No. SACV94-588 LHM
    and All Others Similarly Situated,  )           (EEN)
18                                       )
                   Plaintiff,            ) CLASS ACTION
19                                       )
                                         )
20      vs.                              )
                                         )
21  MTI TECHNOLOGY CORPORATION, RAYMOND ) CLASS ACTION COMPLAINT FOR
    J. NOORDA, NFT VENTURES, INC.,       ) VIOLATIONS OF THE FEDERAL
22  STEVEN HAMERSLAG, BOB COREY, BOB     ) SECURITIES LAWS
    GOETZ, ROBERT YOUNG and DILLON READ )
23  & CO., INC.,                         )
                                         ) Plaintiff Demands A
24                 Defendants.           ) Trial By Jury
    _____ )
25

26

27

28

ENTERED ON ICMS

1       Plaintiff, by his undersigned attorneys for his Complaint
2 against defendants, alleges as follows:

3 <center>NATURE OF THE ACTION</center>

4     1.   This is a class action on behalf of all purchasers of the
5 common stock of MTI Technology Corporation ("MTI" or the "Company")
6 between April 7, 1994 and July 6, 1994 ("Class Period"). This
7 action arises out of a scheme by unscrupulous venture capital
8 investors and corporate insiders to take MTI public, to permit
9 MTI's venture capital investors and insiders to sell shares in the
10 Offering and to create a trading market in MTI's shares via its
11 April 7, 1994 initial public offering of 5.7 million shares at $9
12 per share (the "Offering") and inflate the price of the stock in
13 the aftermarket to a Class Period high of $10 before collapsing to
14 $4 per share when the true adverse facts concerning MTI's troubled
15 business, impaired competitive position, its reduced revenues and
16 its diminished future prospects became known, just 90 days after
17 the Offering.

18     2.   MTI designs, manufactures, markets and services high
19 performance storage solutions of the DEC, IBM and open UNIX systems
20 computing environments. MTI was largely financed by venture
21 capital firms and private investors and during 1992-1993 MTI lost
22 over $18 million before finally earning a small profit for the nine
23 months ended January 31, 1994. However, as these private investors
24 and venture capital firm defendants continued to finance the
25 development of the Company they came to realize that it was
26 increasingly unlikely that MTI would ever become as profitable or
27 successful as they hoped, and that it was encountering serious
28 problems with its business, including an impaired competitive

<center>- 1 -</center>

1   position and poor customer acceptance of its FailSafe product.
2   This created a serious danger for MTI's controlling shareholders
3   and venture capital investors, as they found themselves, after
4   having advanced millions to MTI in an unsuccessful effort to
5   develop the Company into an entity with real prospects of achieving
6   ongoing profitability, they were now locked into an illiquid
7   investment in a business which had a much less promising future
8   than they had hoped and which they knew would never be able to earn
9   enough profits to repay the investments of the venture capital
10  investors, let alone allow them to earn a profitable return on
11  those investments.

12      3.   In order to obtain relief from their unfavorable
13  position, MTI's venture capital investors, controlling shareholders
14  and corporate insiders decided to undertake a public offering of
15  MTI stock to raise a large amount of cash for MTI, to permit them
16  to sell millions in MTI stock they owned to the public and boost
17  the book value of their remaining MTI stock, while shifting the
18  burden of financing MTI's ongoing development to the new public
19  shareholders of the Company.  Such a stock offering would also
20  create a public trading market in MTI stock, so that if these
21  defendants could push the price of MTI stock up to inflated levels
22  in the aftermarket and keep it there until after the "lock up"
23  period following the initial public offering expired[1] they could
24  then sell off large amounts of the MTI stock they owned at huge
25  profits for themselves before the truth about the deterioration in

26  _____

27  [1]    In an initial public offering, it is customary for the under-
    writer to enter into a "lock-up" agreement with the corporation's
28  insiders that they will not sell any of their stock into the after-
    market for 180 days after the offering without the prior written
    consent of the underwriter.

1 MTI's business and its diminished overall prospects for profitable
2 growth became apparent. Thus in late 1993, MTI's venture capital
3 investors, controlling shareholders and insiders decided to
4 undertake a public offering of MTI as soon as possible, as they
5 realized that the adverse facts concerning MTI's business could not
6 be concealed indefinitely and if those facts became known to the
7 public it would prevent a successful public offering of MTI stock
8 and leave MTI's venture capital investors, controlling shareholders
9 and corporate insiders "locked in" to their unfavorable and
10 illiquid position and/or result in MTI stock trading at low prices
11 in the aftermarket, thus restricting their ability to sell off
12 their shares for huge profits in the aftermarket.

13     4.   To accomplish their illegal ends, MTI's venture capital
14 investors, corporate insiders and controlling shareholders sought
15 a securities underwriter who would help them, i.e., Prudential
16 Securities Inc. ("Prudential"), an investment banking firm. After
17 discussions with Prudential, MTI's venture capital investors,
18 corporate insiders and controlling shareholders were satisfied that
19 Prudential was willing to help them to merchandize MTI stock in the
20 Offering, including orchestrating a "Roadshow" in several cities
21 just before the offering to stimulate interest in the Offering and
22 by issuing favorable research reports on MTI after the Offering
23 (i.e., a "booster shot") which would push the price of the stock
24 up. Thus, they selected Prudential as the lead underwriter for the
25 MTI public offering.

26     5.   In order to accomplish defendants' scheme it was
27 necessary for the defendants to deceive the securities markets into
28 believing that MTI's business was successful, had obtained profit-

- 3 -

1    ability, had real potential to grow and would achieve net income
2    and earnings per share growth in 1994 and 1995.  This was done by
3    drafting a Prospectus for the Offering that disclosed no then
4    existing problems with MTI's business, misrepresented MTI's ability
5    to compete in its markets, the success of its FailSafe product line
6    and contained false financial statements for the three and nine
7    months ended January 1, 1994, which failed to report MTI's results
8    in  accordance  with  Generally  Accepted  Accounting  Principles
9    ("GAAP")  or  the  principles  of  fair  reporting.    In  order  to
10   stimulate demand for MTI's stock on the Offering -- thus increasing
11   the offering price -- MTI and the underwriters conducted a multi-
12   city Roadshow in the few weeks prior to the Offering.  During the
13   Roadshow presentations MTI presented a very favorable picture of
14   MTI's current business while forecasting strong future profitable
15   growth in earnings per share through fiscal 1995 and 1996 to end
16   March 31, 1995 and March 31, 1996, respectively. According to MTI,
17   the Company competed effectively, had made changes to its FailSafe
18   product line to distinguish it from competitive products as a
19   result of which sales of the product were excellent, MTI's business
20   was strong and MTI anticipated achieving strong earnings growth in
21   fiscal 1995-1996.  As a result of these positive statements and the
22   growing revenues and profits MTI reported and its apparently
23   promising future prospects, MTI and the other defendants success-
24   fully pulled off MTI's initial public offering of 6.3 million
25   shares (5.7 million shares offered plus 600,000 sold via the
26   underwriters' over-allotment option) at $9 per share on April 7,
27   1994.    MTI sold 4.5 million shares netting $37.5 million, the
28   insiders and controlling shareholders sold 1.8 million shares,

1   netting $15 million. However, all these statements were false and
2   misleading.  At the time of the Offering, MTI was encountering
3   serious problems in its business, several of its customers were
4   deferring or delaying new orders, especially for its FailSafe
5   products and some were attempting to delay or stretching out
6   existing orders or even cancel them, as MTI's competitive position
7   was very poor, the earnings it reported for the nine months ended
8   January 1, 1994 were false and there was no reasonable basis in
9   fact for the earnings forecasts made for fiscal 1995 and 1996,
10  which were, in fact, contradicted by its adverse information known
11  to the insiders.  Thus, not only did MTI not have a promising
12  future, it was likely to suffer declining earnings per share, if
13  not be thrown into a loss position in the near-term.  The true
14  facts concerning MTI's products, business and future prospects were
15  that its FailSafe product line was doing poorly, customers were
16  cancelling existing orders, that MTI had accumulated excessive
17  inventories of obsolete and/or unsalable products and that the
18  problems with MTI's business were so pervasive and serious that
19  MTI's business would be adversely affected throughout fiscal 1995
20  and 1996, and MTI would likely be in a loss position in the short-
21  term.

22       6.   Suddenly on July 6, 1994, MTI revealed that its revenues
23  for the quarter ended July 2, 1994, would be 10%-15% below what it
24  had led the market to expect.  Upon these revelations, MTI's stock
25  collapsed falling from $6-1/2 on July 5 to $4 on July 6, 1994, on
26  huge volume -- a drop of over 33% in one day.  The 6.3 million
27  shares of stock sold to the public at $9 per share by MTI, its
28  controlling shareholders and insiders in April 1994 and which later

- 5 -

1 | advanced to a Class Period high of $10 per share in May, now sells
2 | for less than $4 per share, just 90 days later.  The public has
3 | been fleeced while MTI and MTI's controlling shareholders and
4 | insiders have all profited to the tune of millions of dollars.

5 |     7.  The stock charts below demonstrate the collapse of MTI's
6 | stock price as the true facts about its business emerged; the
7 | insider selling of MTI stock by the Individual Defendants at
8 | inflated prices; and that when compared to an index of similar
9 | stocks, the action of MTI's stock during the Class Period was
10 | largely due to Company specific statements and facts, as opposed to
11 | industry-wide factors or stock movements.



1

## JURISDICTION AND VENUE

2        8.   Jurisdiction exists pursuant to §27 of the Securities
3   Exchange Act of 1934 (the "1934 Act") [15 U.S.C. §78aa], §22 of the
4   Securities Act of 1933 (the "1933 Act") [15 U.S.C. §77v] and 28
5   U.S.C. §1331.   The claims arise under §§11, 12(2) and 15 of the
6   1933 Act [15 U.S.C. §77k, 77l(2) and 77o] and §§10(b) and 20(a) of
7   the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promul-
8   gated thereunder by the SEC [17 C.F.R. §240.10b-5].   Defendants
9   also used the instrumentalities of interstate commerce to commit
10  these violations.

11       9.   Venue is proper in this District, as many of the acts
12  complained of occurred in this District.  The scheme to violate the
13  federal  securities  laws  complained  of  herein  was  primarily
14  orchestrated in this District.  MTI Is headquartered in Anaheim,
15  California.

16

## THE PARTIES

17       10.  Plaintiff David Gross purchased 500 shares of common
18  stock of MTI on April 7, 1994 issued pursuant to MTI's April 7,
19  1994 Registration Statement and Prospectus and was damaged thereby.

20       11.  Defendant MTI designs, manufactures, markets and services
21  high performance storage solutions of the DEC, IBM and open UNIX
22  systems computering environments.  The Company's common stock is
23  actively traded in an efficient market on the NASDAQ Exchange.

24       12.  (a)  At all relevant times, defendant Raymond J. Noorda
25  ("Noorda") has been Chairman of the Board of the Company.  Noorda
26  made false statements and sold stock while in the possession of
27  material adverse, non-public information regarding the Company.
28  Noorda owns and controls defendant NFT Ventures, Inc. ("NFT"), his

- 8 -

1    venture capital entity. Noorda and NFT owned over 8 million shares
2    of MTI stock -- 52.6% of its outstanding stock prior to the
3    Offering, of which they sold 650,000 shares for $5,850,000.
4    Because of Noorda's position with the Company, he had access to the
5    adverse non-public information about its business, finances,
6    products, markets and present and future business prospects via
7    access to internal corporate documents (including the Company's
8    operating plan, budget and forecast and reports of actual opera-
9    tions compared thereto), conversations and connections with other
10   corporate officers and employees, attendance at management and
11   Board of Directors' meetings and committees thereof and via reports
12   and other information provided to them in connection therewith.

13            (b)  At all relevant times, defendant Steven J. Hamerslag
14   ("Hamerslag") has been President, Chief Executive Officer and a
15   Director of the Company. Hamerslag made false statements and sold
16   stock while in the possession of material adverse, non-public
17   information regarding the Company.  Hamerslag owned 2,662,592
18   shares of MTI stock -- 17% of its outstanding shares at the time of
19   the Offering, of which he sold 300,000 shares for $2.7 million.
20   Because of Hamerslag's position with the Company, he had access to
21   the adverse non-public information about its business, finances,
22   products, markets and present and future business prospects via
23   access to internal corporate documents (including the Company's
24   operating plan, budget and forecast and reports of actual opera-
25   tions compared thereto), conversations and connections with other
26   corporate officers and employees, attendance at management and
27   Board of Directors' meetings and committees thereof and via reports
28   and other information provided to them in connection therewith.

- 9 -

1         (c)   At all relevant times, defendant Bob Corey ("Corey")

2 has been Vice President, Finance and Chief Financial Officer of the

3 Company.   Corey made false statements about the Company while in

4 the possession of material adverse, non-public information

5 regarding the Company.   Because of Corey's position with the

6 Company, he had access to the adverse non-public information about

7 its business, finances, products, markets and present and future

8 business prospects via access to internal corporate documents

9 (including the Company's operating plan, budget and forecast and

10 reports of actual operations compared thereto), conversations and

11 connections with other corporate officers and employees, attendance

12 at management and Board of Directors' meetings and committees

13 thereof and via reports and other information provided to them in

14 connection therewith.

15         (d)   At all relevant times, defendant Bob Goetz ("Goetz")

16 has been Senior Vice President, Sales and a Director of the

17 Company.   Goetz made false statements and sold stock while in the

18 possession of material adverse, non-public information regarding

19 the Company.   Goetz owned 283,750 shares of MTI stock at the time

20 of the Offering of which he sold 95,000 shares for $855,000.

21 Because of Goetz's position with the Company, he had access to the

22 adverse non-public information about its business, finances,

23 products, markets and present and future business prospects via

24 access to internal corporate documents (including the Company's

25 operating plan, budget and forecast and reports of actual opera-

26 tions compared thereto), conversations and connections with other

27 corporate officers and employees, attendance at management and

28

- 10 -

1    Board of Directors' meetings and committees thereof and via reports

2    and other information provided to them in connection therewith.

3         (e)  At all relevant times, defendant Robert Young

4    ("Young") has been a Director of the Company.  Young is a Managing

5    Director of defendant Dillon Read & Co. Inc. ("Dillon Read"), was

6    controlled by it and served as its representative and agent on

7    MTI's Board of Directors.  Young and Dillon Read owned 1,060,574

8    shares of MTI stock -- 7.1% of its outstanding stock at the time of

9    the Offering, of which they sold 300,393 shares, getting $2.7

10   million.  Because of Young's position with the Company, he had

11   access to the adverse non-public information about its business,

12   finances, products, markets and present and future business

13   prospects via access to internal corporate documents (including the

14   Company's operating plan, budget and forecast and reports of actual

15   operations compared thereto), conversations and connections with

16   other corporate officers and employees, attendance at management

17   and Board of Directors' meetings and committees thereof and via

18   reports and other information provided to them in connection

19   therewith.

20        13.  The individuals named as defendants in ¶12(a)-(e) are

21   sometimes referred to herein as the "Individual Defendants."  At

22   all times material hereto, each of the Individual Defendants was

23   the agent of the Company, and at all times acted within the course

24   and scope of said agency.  Each of the Individual Defendants signed

25   MTI's April 7, 1994 Registration Statement which was effective with

26   the SEC that date.

27        14.  Defendants Noorda, NFT, Hamerslag, Young and Dillon Read,

28   by reason of their stock ownership, management position, and/or

- 11 -

1    membership on the Company's Board of Directors, were controlling
2    persons of the Company and had the power and influence, and
3    exercised the same, to cause MTI to engage in the illegal practices
4    complained of herein.  Defendant Dillon Read & Co. Inc. controlled
5    Young and had the power and influence and exercised the same to
6    cause Young to engage in the illegal procedures complained of
7    herein.  MTI controlled each of the Individual Defendants.

8         15.  As officers, directors and/or controlling persons of a
9    publicly-held company whose stock is registered with the SEC under
10   the Exchange Act and traded on the NASDAQ National Market System,
11   the Individual Defendants had a duty to promptly disseminate
12   accurate and truthful information with respect to the Company's
13   operations, business, products, markets, management, earnings,
14   present and future business prospects, to correct any previously
15   issued statements that had become untrue and to disclose any
16   adverse trends that would materially affect the present and future
17   financial operating results of the Company, so that the market
18   price of the Company's stock would be based upon truthful and
19   accurate information.

20        16.  The Individual Defendants, because of their positions
21   with the Company, controlled the contents of its quarterly and
22   annual reports, press releases and presentations to securities
23   analysts.  Each Individual Defendant was provided with copies of
24   the Company's reports and press releases alleged herein to be mis-
25   leading prior to or shortly after their issuance and had the
26   ability and opportunity to prevent their issuance or cause them to
27   be corrected.  Because of their positions and access to material
28   non-public information available to them but not the public,  each

- 12 -

1    of these defendants knew or recklessly disregarded that the adverse

2    facts specified herein had not been disclosed to and were being

3    concealed from the public and that the positive representations

4    which were being made were then false and misleading. As a result,

5    each of the Individual Defendants is responsible for the accuracy

6    of the public reports and releases detailed herein as "group

7    published" information and is therefore responsible and liable for

8    the representations contained therein.

9                        MTI'S INTERNAL FORECASTS,
                         PLANS AND PROJECTIONS

10

11        17.  A key management tool for the Company's top executives

     was its business plan, budget, forecast and/or projection, by which
12
     the Company's top executives set performance goals for MTI and then
13
     closely monitored the corporation's actual performance, i.e.,
14
     results of operations, compared to the planned, budgeted and/or
15
     forecasted results on a constant basis. These plans, forecasts and
16
     budgets were prepared on an annual basis and updated during the
17
     year.  All of the Individual Defendants were aware of MTI's
18
     internal plan, forecast and budget and of the internal reports
19
     prepared and circulated, at least monthly, comparing MTI's actual
20
     results to those previously planned, budgeted and/or forecasted.
21
     MTI's top executives used its internal plan, budget and forecast as
22
     the basis for the statements they made publicly about the Company's
23
     performance during fiscal 1995-1996.   Based on the negative
24
     internal reports of the Company's actual business performance
25
     compared to that planned, budgeted and forecasted, the defendants
26
     knew or recklessly disregarded that those public statements, and
27
     those of securities analysts for which the Company is responsible,
28

                                  - 13 -

1  were false and misleading when made and were inflating the market
2  price of MTI's stock.

3                    FRAUD-ON-THE-MARKET DOCTRINE

4      18.   The market for MTI stock is an efficient market for the
5  following reasons, among others:

6          (a)   MTI met the requirements for listing, and was listed
7  on the NASDAQ National Market System ("NASDAQ"), a highly efficient
8  and automated market;

9          (b)   As a regulated issuer, the Company filed periodic
10 public reports with the SEC;

11         (c)   The Company's trading volume was substantial,
12 averaging above 50,000 shares per day during the Class Period,
13 thereby reflecting numerous trades each day; and

14         (d)   The Company was followed by analysts employed by
15 brokerage firms who wrote reports which were distributed to the
16 sales force and certain customers of their respective brokerage
17 firms and which were available to the public.   Each of these
18 reports was publicly available and entered the public marketplace.
19 The brokerage firms which issued research reports on the Company
20 during the Class Period are identified herein.

21                   PLAINTIFF CLASS ALLEGATIONS

22      19.   Plaintiff brings this action as a class action pursuant
23 to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of
24 all persons ("the Class") who purchased the common stock of the
25 Company between April 7, 1994 through July 6, 1994.   Excluded from
26 the Class are the defendants and members of their immediate
27 families, officers and directors of MTI, any entity in which a

28

                              - 14 -

1 defendant has a controlling interest and the legal representatives,
2 heirs, successors or assigns of any such excluded party.

3      20.   The members of the Class are so numerous that joinder of
4 all members is impractical.   While the exact number of Class
5 members is unknown to plaintiff at the present time, the Company
6 has more than 15 million shares of common stock outstanding, owned
7 by many hundreds of shareholders throughout the country.

8      21.   Plaintiff's claims are typical of the claims of the Class
9 because plaintiff and all the Class members sustained damages which
10 arose out of the defendants' wrongful conduct complained of herein.

11      22.   Plaintiff is a representative party who will fully and
12 adequately protect the interests of the Class members.   Plaintiff
13 has retained counsel who are experienced and competent in both
14 class action and securities litigation. Plaintiff has no interests
15 which are contrary to or in conflict with those of the Class he
16 seeks to represent.

17      23.   A class action would be superior to all other available
18 methods for the fair and efficient adjudication of this contro-
19 versy.   Plaintiff knows of no difficulty to be encountered in the
20 management of this action that would preclude its maintenance as a
21 class action.

22      24.   The prosecution of separate actions by individual Class
23 members would create a risk of inconsistent and varying adjudica-
24 tions concerning the subject of this action, which adjudications
25 could establish incompatible standards of conduct for defendants
26 under the laws alleged herein.   Further, questions of law and fact
27 common to the members of the Class predominate over any questions
28 which may affect only individual members in that defendants have

- 15 -

1    acted on grounds generally applicable to the entire Class. Among

2    the questions of law and fact common to the Class are:

3         (a)  Whether the federal securities laws were violated by

4    defendants' acts as alleged herein;

5         (b)  Whether  MTI's  and  its  underwriters'  publicly

6    disseminated statements during the Class Period omitted and/or

7    misrepresented material facts;

8         (c)  Whether defendants participated in and pursued the

9    scheme and course of conduct complained of;

10        (d)  Whether defendants acted willfully or recklessly in

11   omitting and/or misrepresenting material facts or in scheming to

12   make such misstatements;

13        (e)  Whether the market prices of MTI common stock during

14   the  Class  Period  were  artificially  inflated  due  to  the

15   nondisclosures and/or misrepresentations complained of herein; and

16        (f)  The extent of injuries sustained by members of the

17   Class and the appropriate measure of damages.

18                 MTI'S GUIDANCE TO SECURITIES ANALYSTS,
                   USE OF THEM AS A CONDUIT TO FEED FALSE
19                 INFORMATION TO THE SECURITIES MARKETS
                   AND ADOPTION OF THEIR REPORTS AS ITS OWN

20

21        25.  Analysts employed by securities firms prepare written

     reports and make recommendations about public companies such as
22
     MTI.  MTI, in fact, was followed by securities analysts employed by
23
     brokerage houses which issue reports and make recommendations
24
     concerning MTI's common stock to their clients.  In writing their
25
     reports, these analysts rely in substantial part upon information
26
     provided by and statements and reports made publicly by the
27
     Company, information provided to them privately by the Company, and
28
     assurances by the Company that information in the analysts' reports

                              - 16 -

1    is not at material variance from the Company's internal knowledge
2    of its operations and prospects.

3         26.  Because MTI stock was a "growth stock" and traded at a
4    high price/earnings ratio, MTI's stock price was particularly
5    sensitive to the Company's and analysts' statements regarding the
6    Company's future profits.  MTI's top officers, including Hamerslag
7    and Corey, used their communications to analysts to assure them
8    that MTI's business was strong, demand for its products was
9    excellent and the Company was on track to achieve strong earnings
10   per share growth throughout 1994 and 1995.

11        27.  Prior to and during the Class Period, it was the
12   Company's practice to have its top officers and key members of
13   MTI's management team (principally Hamerslag and Corey) communicate
14   regularly with securities analysts at the firms whose reports are
15   identified herein, on a regular basis to discuss, among other
16   things, the Company's prospects, its products, operating results,
17   anticipated revenues and to provide detailed "guidance" to these
18   analysts with respect to the Company's business and projected
19   revenues and earnings.  These communications included, but were not
20   limited to, frequent conference calls, meetings, and analyst
21   briefings where the defendants discussed many aspects of the
22   Company's operations and financial prospects.  In addition, when
23   MTI issued its quarterly financial results, it held a briefing for
24   securities analysts, normally via a telephone conference call
25   conducted by Hamerslag and Corey to put a favorable "spin" on its
26   results.   The defendants knew that by participating in these
27   regular, periodic communications with analysts, the Company could
28   disseminate information to the investment community and investors

1    would rely and act upon such information (i.e., make purchases and

2    sales of the Company's securities). The defendants had these

3    communications with analysts in order to cause or encourage them to

4    issue favorable reports on MTI and used these communications to

5    falsely present the successful prospects of MTI to the marketplace

6    and to artificially inflate the market price of MTI's common stock.

7          28. The information about MTI contained in the various

8    securities analysts' reports, quoted herein, was obtained from or

9    based on information obtained from MTI, as discussed above, and

10    copies of drafts of these reports were provided to MTI and its top

11    officers before they were released, and those drafts were reviewed

12    and approved by them. MTI knew of these reports, their contents,

13    that they were based on information provided by MTI, and that they

14    would be issued to members of the investing public, be circulated

15    throughout the investment community and impact the trading price of

16    MTI's common stock. During the Class Period, MTI issued an

17    investor relations package to members of the financial press,

18    prospective investors in MTI and MTI's existing shareholders, which

19    package included copies of the Prudential research reports issued

20    during the Class Period. MTI thus endorsed these reports, adopted

21    them as its own and placed its imprimatur on them as well as the

22    projections, forecasts and statements contained therein. The

23    reports circulated and adopted by MTI included the Prudential

24    reports of May 9, 16 and 24, 1994. Despite its duty to do so, MTI

25    failed to correct these statements during the Class Period.

26          29. The investment community, and in turn, investors, relied

27    and acted upon the information communicated in these written

28    reports that presented favorable information about MTI and

1   frequently recommended that investors purchase MTI common stock.
2   MTI directly and indirectly manipulated and inflated the market
3   price of MTI stock by falsely presenting to analysts, through
4   regular  meetings  and  during  both  telephonic  and  written
5   communications, the prospects of the Company and by failing to
6   disclose the true adverse information about the Company that was
7   known to it.

## THE SCHEME AND COURSE OF CONDUCT

9   30.   Each of the defendants is liable as a primary violator as
10  a direct or indirect participant in making materially false and
11  misleading statements and as a direct or indirect participant in a
12  scheme to commit the violations of law complained of herein.   In
13  committing the wrongful acts alleged herein, all of the defendants
14  pursued a scheme, course of conduct and/or conspired with one
15  another, in furtherance of their common goal, i.e., inflating the
16  price of MTI stock via false and misleading statements, the
17  concealment of material adverse information and other manipulative
18  actions.   The scheme, common course of conduct and conspiracy was
19  designed to and did:   (i) deceive the investing public, including
20  plaintiff and the other Class members, regarding the demand for
21  MTI's products, its financial condition and its future business
22  prospects; (ii) accomplish the initial public offering of MTI's
23  stock which would greatly benefit its controlling shareholders and
24  then artificially inflate the market price of MTI common stock
25  during the Class Period; (iii) cause plaintiff and other members of
26  the Class to purchase MTI common stock at inflated prices; (iv)
27  permit MTI and certain MTI controlling shareholders to sell MTI
28  common stock at inflated prices; and (v) increase the value of

- 19 -

1    options to purchase MTI stock owned by certain of the Individual
2    Defendants.    In furtherance of this plan, scheme and course of
3    conduct, defendants, and each of them, took the actions alleged
4    herein.

5        31.    Defendants' scheme, course of conduct and conspiracy
6    commenced during 1993.    They falsely presented the Company's
7    current and future business prospects and created an illusion of
8    continued earnings growth. The defendants engaged in this scheme,
9    common course of conduct and conspiracy so that they could inflate
10   the price of the Company's stock in order to:    (i) in the case of
11   the Individual Defendants -- protect and enhance their executive
12   positions and the substantial compensation and prestige they
13   obtained thereby; (ii) in the case of MTI's venture capital
14   investors and controlling shareholders -- permit them to sell some
15   of their MTI stock in the Offering, while enhancing the value of
16   their holdings of MTI stock and/or options to purchase MTI stock;
17   (iii) in the case of certain MTI shareholders -- sell shares of MTI
18   common stock they owned or acquired via the exercise of stock
19   options at inflated prices to obtain large amounts of cash and
20   large profits; (iv) in the case of the officers of MTI, cover up
21   their mismanagement of the Company and thus hold onto their
22   lucrative executive positions as long as possible; and (v) in the
23   case of MTI and its insiders, to try to keep MTI's stock price at
24   high levels so that the stock could be sold in the aftermarket or
25   used by MTI to acquire other businesses on favorable terms or sold
26   by it in a secondary public stock offering to raise capital for MTI
27   on favorable terms if either such opportunity presented itself.

28

1   32. In taking the actions, particularized herein, to parti-
2   cipate in this scheme and course of conduct, each defendant acted
3   with knowledge of the wrongdoing and knowingly and intentionally
4   furthered the accomplishment of the fraud.

5   33. This action arises out of dishonest conduct by entre-
6   preneurs and venture capital investors who pursued a scheme to take
7   MTI public while then and for months thereafter misrepresenting the
8   condition of its business, its growth potential, its diminished
9   competitive position problems with its FailSafe line of products
10  and its diminished prospects for future profitable growth. MTI's
11  insiders and controlling shareholders knew that MTI's business was
12  not succeeding as well as they had hoped, was suffering from severe
13  problems in its largest product line (FailSafe) and thus had much
14  more limited growth prospects than they had previously believed,
15  such that it was likely that MTI would never become sufficiently
16  profitable to allow the venture capital investors to recover their
17  investment in MTI, let alone earn any profit on that investment.
18  Thus, in order to raise millions for MTI from the investing public
19  to benefit MTI's controlling shareholders, create a public trading
20  market in MTI stock so those insiders could sell thousands of their
21  MTI shares and also enable them to get additional capital for MTI,
22  defendants pursued the scheme and course of conduct complained of.
23  By inflating the Offering price of MTI stock, these defendants
24  benefitted greatly, while public investors lost millions.

25  34. During the Class Period, defendants issued positive
26  public statements to the effect that MTI was a leader of a growing
27  industry with great growth potential, was achieving profitable
28  growth, had excellent management and strong financial controls, was

- 21 -

1   competing effectively, and was enjoying strong demand for its
2   products -- which would result in continued profitable growth for
3   MTI through fiscal 1995 and 1996. Defendants knew these
4   representations were false when made, would artificially inflate
5   the price of MTI stock, and would allow MTI to raise millions in
6   new capital to benefit its venture capital investors, controlling
7   shareholders and its insiders, while permitting them to sell some
8   of the stock.

9       35.   In 1993, the controlling shareholders of MTI were in a
10  difficult and threatened position. They were "locked in" MTI, then
11  a private corporation, without any way to realize on their invest-
12  ment by selling their shares into a trading market even though they
13  knew that MTI's long-term growth prospects were severely
14  diminished. A private sale of MTI, or private equity infusion was
15  not feasible, as any such sophisticated private buyer or investor
16  would demand and get a right to conduct a due diligence investiga-
17  tion of MTI, inspect its books and records, and discover the
18  serious problems affecting MTI's business and its diminished growth
19  prospects. However, a sale of stock in MTI to public investors by
20  merchandising the Company's stock via false and misleading state-
21  ments would provide MTI's controlling shareholders and insiders
22  with a means of raising cash, thus benefitting them financially and
23  creating an ongoing trading market in MTI stock, enabling them to
24  bail out of part of their investment in MTI by selling some of the
25  MTI stock they owned into the marketplace at inflated prices after
26  the Offering if they could keep MTI's stock price inflated until
27  after the "lock up" period expired.

28

1    36.   Defendants' scheme was successful in part.   Taking the
2    Company public was engineered by creating demand for the stock for
3    the initial public offering in April 1994 by staging what is known
4    as a "Roadshow" at which top executives of the Company met with
5    potential investors in major cities throughout the United States
6    and presented an extremely positive picture of MTI and forecast
7    that the corporation would enjoy strong continued profitable
8    growth.   The infusion of millions of dollars of capital into MTI
9    immediately benefitted its controlling shareholders, instantly and
10   substantially increasing the book value of the MTI stock they owned
11   by over 117% from $1.25 per share to $2.71 per share -- a $22+
12   million windfall for these controlling shareholders.   In addition,
13   the public offering created a trading market in MTI stock which
14   valued it at $9 per share -- creating millions in wealth for the
15   corporation's insiders, controlling shareholders and venture
16   capital insiders, who continued to own over 15 million shares.
17   However, they were unable to keep MTI's stock price inflated until
18   after the lock up expired, as the continued deterioration in MTI's
19   business was so severe and rapid it could not be covered up and
20   concealed for that long.

21   37.   Defendants realized that because MTI had incurred years
22   of losses prior to the public offering and because the prospectus
23   by which MTI's initial public offering would take place would have
24   to be reviewed by the SEC, it would be necessary for that
25   prospectus to contain "risk factors" about MTI's business, product
26   technology and future business prospects.   They also knew that the
27   prospectus would not be able to contain many positive representa-
28   tions about the state of MTI's business or the Company's future

- 23 -

1   business prospects. Because of this the initial public offering of
2   MTI stock would have been at a relatively low price per share.
3   Prudential and MTI's top officers knew it could circumvent this
4   situation by disseminating very positive information and forecasts
5   of future profitable growth during the "Roadshow" to overcome any
6   risk factors in the Prospectus and by having one or more of the co-
7   lead underwriters of the MTI initial public offering issue
8   extremely bullish and false research reports on MTI as soon as they
9   could after the public offering. These research reports, of
10   course, are not subject to review by any governmental agency prior
11   to issuance and, unlike the MTI prospectus, did not contain
12   extensive risk factors with respect to MTI's product technology or
13   business prospects; but rather, presented the Company in a very
14   positive light, indicating that the Company's business was doing
15   very well, had a superior competitive position, had less risks than
16   other rapidly growing companies, while forecasting very strong
17   earnings and profit growth for MTI in fiscal 1995 and 1996.

18      38. Immediately after the Offering of MTI stock in April
19   1994, in order to drive the price of MTI stock higher, defendants
20   began to make many false and misleading statements about MTI's
21   business and future business prospects, including having the
22   Underwriters issue very positive reports on MTI which disseminated
23   very positive information, projecting strong continued profitable
24   growth for MTI through 1994 and 1995.

25
26

<center>FALSE AND MISLEADING STATEMENTS<br>DURING THE CLASS PERIOD</center>

27      39. In the few weeks prior to MTI's April 7, 1994 initial
28   public offering, MTI via Noorda, Hamerslag and Corey participated
   in the "Roadshow" to help stimulate interest in the upcoming stock

<center>- 24 -</center>

1   sale and create demand for the stock.  These Roadshow presentations

2   took place in several cities, including New York City, Chicago and

3   San  Francisco  and  were  attended  by  institutional  investors,

4   securities analysts and other prospective purchasers of MTI stock.

5   A principal purpose of the Roadshow was to circulate very favorable

6   information about MTI's business that could not be included in the

7   Prospectus, including forecasts of substantial earnings per share

8   growth throughout fiscal 1995 and 1996.  Thus, at the Roadshow

9   meetings those participating represented that all areas of MTI's

10  business were performing very well, that orders for its products

11  including  its  FailSafe  product  were  strong  and  growing,  its

12  competitive position was excellent and that MTI would achieve

13  strong growth in both revenues, profits and earnings per share

14  during fiscal 1995-1996.  The statements on the Roadshows increased

15  the demand for and the selling price of MTI stock on the Offering

16  and in the aftermarket.

17          40.    The April 7, 1994 Prospectus indicated that MTI had

18  become profitable in fiscal 1994 after years of large losses:

19                     Summary Consolidated Financial Information
                          (In thousands, except per share data)

20

21                                                              Nine Months Ended

|                       | Year Ended April 4, |            | January 2, | January 1, |
|-----------------------|----------|-----------|------------|------------|
|                       | 1992     | 1993      | 1993       | 1994       |
| Consolidated Statement of Operations Data: |          |           |            |            |
| Net product revenue   | $ 86,970 | $ 97,034  | $ 67,154   | $ 67,412   |
| Service revenue       | 17,227   | 18,644    | 12,568     | 18,373     |
| Total revenue         | 104,197  | 115,678   | 79,722     | 85,785     |
| Net income (loss)     | $(12,949)| $ (5,676) | $ (7,937)  | $ 1,494    |
| Income (loss) per share | (1.46) | $   (.45) | $   (.67)  | $    .09   |

27

28

                              - 25 -

1     41. With respect to MTI's quarterly performance, the
2   Prospectus presented the following information:

| | Quarter Ended | | | | | | |
|---|---|---|---|---|---|---|---|
| | 7/4/92 | 10/3/92 | 1/2/93 | 4/3/93 | 7/3/93 | 10/2/93 | 1/1/94 |
| Quarterly Results: | | | | | | | |
| Net product revenue | $20,485 | $26,600 | $20,069 | $29,880 | $24,325 | $17,594 | $25,493 |
| Service revenue | 3,302 | 4,246 | 5,020 | 6,076 | 5,712 | 5,980 | 6,681 |
| Total revenue | 23,787 | 30,846 | 25,089 | 35,956 | 30,037 | 23,574 | 32,174 |
| Net income (loss) | $(1,265) | $ 938 | $(7,610) | $ 2,261 | $ 281 | $ 1 | $ 1,212 |

11     42. The financial results for the three and nine months ended
12   July 1, 1994 were artificially inflated by way of the accounting
13   tricks detailed in ¶¶61-67. MTI and the other signatories of the
14   Registration Statement represented that the financial statements
15   for the period ended January 1, 1994 were prepared in accordance
16   with GAAP and contained all adjustments necessary to fairly present
17   MTI's financial results and condition.

18     43. The Prospectus described MTI's business as follows:

19          MTI designs, manufactures, markets and services high
20       performance storage solutions for the DEC, IBM and open
21       UNIX systems computing environments. These storage
22       solutions integrate MTI's proprietary application and
23       imbedded software with its advanced servers and industry
24       standard storage peripherals. This integration of
25       software and server technologies, designated by the
26       Company as its Universal Storage Architecture, provides
27       storage solutions designed to meet customers' information
28       management requirements relating to high performance,

1    reliability and data integrity.   In addition, unlike

2    storage solutions that are dedicated to a specific

3    operating system, this Architecture allows a customer to

4    migrate the Company's systems across multiple hosts,

5    servers and networking interfaces. The Company's current

6    products, many of which utilize its patented RAID,

7    networking, fault tolerant and other server technologies,

8    include its StingRay, StingRAID and FailSafe storage

9    servers, NetBacker client server application software,

10   Infinity Automated Tape Library Series, and other storage

11   systems and related application software.

12       The ability of MTI's products to provide storage

13   solutions for a variety of computing environments allows

14   the Company to address the evolving needs of its

15   customers.   In recent years, advances in technology have

16   enabled companies to use computers for an increasing

17   number of storage intensive tasks. At the same time, the

18   computing environments in which these tasks are performed

19   are evolving from proprietary, closed operating systems

20   to open systems.   This evolution has created an environ-

21   ment where a single customer may operate computers from

22   multiple manufacturers, each of which uses a different

23   operating system or interface.   These developments have

24   created a need for flexible storage solutions that can

25   operate across multiple operating systems and interfaces.

26   With its Universal Storage Architecture, MTI addresses

27   the need for high performance storage solutions that

28   offer cross-platform compatibility.

1

\* \* \*

2   The Company's customers represent a cross section of

3   industries and governmental agencies and range from

4   Fortune 1000 companies to small businesses. Recent

5   customers include Bankers Trust Company, Burroughs

6   Wellcome Co., Compaq Computer Corporation, Fidelity

7   Investments, Inc., Hughes Aircraft Co., Motorola, Inc.

8   and Silicon Graphics, Inc. Since April 1991, more than

9   90% of the Company's total revenue has been derived from

10   products and services for the Digital Equipment Corpora-

11   tion ("DEC") computing environment. Recently, the

12   Company has increased its focus on and expanded its

13   product and service offerings for the IBM AS/400 and open

14   UNIX systems computing environments through the intro-

15   duction of new products and the acquisition of substan-

16   tially all of the assets of a competitor, System

17   Industries.

18   44. While the April 7, 1994 Prospectus continued a list of

19 risk factors, none of them indicated that at the time of the

20 Offering MTI was having any problems with its business, which were

21 materially adversely impacting its revenues, net income and

22 earnings per share. In fact, at least one of them was false and

23 misleading.

24   45. With respect to competition, the Prospectus stated:

25   Significant Competition. The Company competes with

26   many companies in various markets, including DEC, IBM and

27   EMC Corporation, each of which has substantially greater

28   name recognition, engineering, manufacturing and

- 28 -

1  marketing capabilities, and greater financial and
2  personnel resources than the Company. In addition, the
3  Company expects increased competition from other
4  established and emerging computer storage hardware and
5  data management software companies. The principal
6  elements of competition in the Company's markets include
7  product quality and reliability, price and performance
8  characteristics, and responsiveness to customers. The
9  Company believes that it competes favorably with respect
10  to these factors. In addition, increased competitive
11  pressure could lead to intensified price-based competi-
12  tion, which could materially adversely affect the
13  Company's results of operations. There can be no
14  assurance that the Company will be able to compete
15  successfully in the future or that competition will not
16  have a material adverse effect on the Company's results
17  of operations.

18  46. The foregoing statement about competitive risks was in
19  and of itself false and misleading. At the time of the Offering,
20  the Company was already encountering greatly intensified
21  competition, especially from DEC and that competition was already
22  leading to intensified price-cutting in MTI's main market, which
23  was already having a materially adverse effect on the Company's
24  results of operations. In addition, it was not true that the
25  Company competed favorably with respect to product quality and
26  reliability, price and performance characteristics and respon-
27  siveness to customers as, in fact, its products, especially its
28  FailSafe and StingRay line of products, were not of superior

- 29 -

1   quality or reliability and, due to MTI's excessive costs, it was

2   not able to effectively compete on price because its margins were

3   thinner than its competitors and the price-cutting which was going

4   on in its main markets was adversely affecting its profitability

5   much more than its competitors'.

6       47.  Elsewhere, the Prospectus stated:

7   Comparison of Nine Months Ended January 1, 1994
    to Nine Months Ended January 2, 1993

8

9       Net Product Revenue:  Net product revenue was level

10  for the nine months ended January 1, 1994 and January 2,

11  1993.   In the first nine months of fiscal year 1994,

12  revenue from the Company's high-end StingRay servers

13  increased 181% or approximately $20.0 million and sales

14  of products acquired from System Industries amounted to

15  approximately $2.3 million.  These increases were offset

16  by a decrease in sales of the Company's FailSafe product

17  line of approximately $4.5 million, from $9.4 million

18  during the nine months ended January 2, 1993 to $4.9

19  million during the nine months ended January 1, 1994, and

20  a decrease of approximately $21 million in sales of

21  products utilizing SDI/STI interfaces which were

22  discontinued as a result of the DEC settlement.   The

23  Company believes the decrease in revenues from the

24  FailSafe product line during this period resulted from

25  price reductions in competitive products that offer some,

26  but not all, of the features of FailSafe.  The Company

27  does not believe that the decline in FailSafe revenues

28  for the nine months ended January 1, 1994 is necessarily

    representative of the level of FailSafe revenues to be

- 30 -

1    expected in future periods. The Company has made recent
2    product enhancements to FailSafe which it believes
3    distinguish it from other similarly priced competitive
4    products currently available. The Company intends to
5    continue to enhance the FailSafe product and to incor-
6    porate the embedded technology utilized in FailSafe into
7    other product lines.

8    48.  The above statements relating to the FailSafe product

9    line were false and misleading.  The decrease in revenues in the

10   FailSafe product line during the nine months ended January 1, 1994

11   did not primarily result from price reductions in competitive

12   product, but rather, from customer dissatisfaction with the

13   performance of the FailSafe line of products and the fact that that

14   product did not offer as many features in a cost-effective manner

15   as did competitive products.  It was also false and misleading that

16   the Company did not believe that the decline in FailSafe revenues

17   for the nine months ended January 1, 1994 was necessarily repre-

18   sentative of the level of FailSafe revenues to be expected in the

19   future, as at the time of the Offering, defendants knew that the

20   decline in FailSafe sales was continuing and, indeed accelerating

21   which fact MTI was attempting to disguise by offering special

22   inducements and other promises to get customers to "purchase"

23   FailSafe products including unlimited rights of return.  It was

24   also  false  and  misleading  to  suggest  that  recent  product

25   enhancements to FailSafe would distinguish it from other similarly

26   competitively priced products, as the recent product enhancements

27   to FailSafe did no more than bring it to a level equivalent with

28

- 31 -

1   similarly priced competitive products and in no material way
2   distinguished the FailSafe line of product.

3       49.   On May 9, 1994, immediately after the expiration of the
4   SEC mandated "quiet period" following the April 7, 1994 MTI public
5   offering, Prudential issued a very bullish research report on MTI,
6   which forecast earnings per share of $.65 and $1.00 for the fiscal
7   years to end March 31, 1995 and 1996, respectively.   The report
8   also stated:

9       Increasing Demand for High-Performance
        Storage Solutions-Initiating Coverage
10      With a Strong Buy

11          MTI    Technology,    headquartered    in    Anaheim,
12      California, designs, manufactures, markets, and services
13      high-performance storage solutions for the mid-range DEC,
14      IBM, and UNIX computing environments.   These storage
15      solutions integrate MTI's proprietary application and
16      embedded software with the company's advanced servers and
17      industry-standard storage peripherals.   This integration
18      of software and server technologies, designated by MTI as
19      its Universal Storage Architecture, allows a customer to
20      migrate the company's systems across multiple hosts,
21      servers, and network interfaces.   MTI is the only vendor
22      currently providing such a high level of cross-platform
23      capability.

24      **Broad Patent Portfolio Addresses Critical Technology**
25      **Bottleneck.**   Increased computer processing power and
26      memory-intensive software applications continue to expand
27      the need for online storage and uninterrupted access to
28      data.   This contributed to a $6 billion annual market for

- 32 -

1    mid-range storage systems.  Although the performance of

2    existing storage systems has increased, the improvement

3    has lagged behind the twentyfold increase in computer

4    processing power that has occurred over the last decade,

5    creating an input/output ("I/O") performance gap between

6    the computer and the data storage device.   Seeking

7    maximum performance and fault-tolerance, many users are

8    adopting what are known as RAID storage systems; MTI owns

9    the patents on core RAID technologies.

10   **40%-45% Earnings Growth Due To MTI's Leading Technology**

11   **and Service.**  In recent independent performance-benchmark

12   tests, MTI's key products demonstrated at least a 40%

13   price/performance advantage over the competition, and MTI

14   has the only truly cross-platform product line in the

15   mid-range storage industry.

16        The company's customer service has consistently

17   ranked #1 among all mid-range vendors in a business that

18   requires an increasingly high degree of product support

19   and storage applications expertise.  Combined, this

20   product and service strength should result in powerful

21   earnings gain in fiscal 1995 (March) and beyond.  We

22   expect fiscal-1994 earnings per share to come in at $0.15

23   (pro forma) on $126 million in revenue, after which we

24   forecast a steep ramp to $0.65 on $186 million in revenue

25   in fiscal 1995.  Fiscal 1996 should bring at least $1.00

26   in earnings per share on $234 million in revenue.

27   **MTI Advanced Products Target High-Growth Market Segments.**

28   The $6 billion market available to MTI is comprised of

-- 33 --

1    all mid-range DEC, IBM, and UNIX storage equipment and
2    software; and the combined growth rate of these markets
3    is expected to be about 10%.  However, MTI's most
4    advanced products are targeted at market segments growing
5    at rates of 60%-75%, including RAID (Redundant Arrays of
6    Inexpensive Disks) storage systems, storage management
7    software, and high-performance 8mm tape drives.  Over
8    1994, we expect over half of MTI's business from
9    customers in these market segments.

10   **Which Should Accelerate Revenue and Earnings Growth.**
11   Over the last year, MTI's revenues have advanced from
12   $116.7 million to $123.0 million, a modest 6.3%.
13   <u>Obscured by this apparently meager growth rate has been</u>
14   <u>a radical shift away from sales of commodity, device-</u>
15   <u>level products to higher-margin, higher-value-added</u>
16   <u>storage systems.</u>  Revenue from these products shot up
17   from $65 million in fiscal 1993 to an estimated $90
18   million in 1994 -- or 94% of product revenues.  <u>We expect</u>
19   <u>these products to drive 25%-30% top-line growth over the</u>
20   <u>next 2-3 years, while earnings per share should grow over</u>
21   <u>50% in fiscal 1996.</u> . . .

22   . . . [W]e believe that MTI is better-positioned to
23   capture share in the high-growth segments of the storage
24   systems market and has a patent-protected technology
25   advantage over its competitors.

26   **Risks Are Typical Of Those Faced By Most Technological**
27   **Companies.**  Almost every technology company faces a
28   variety of competitive, development, and execution

- 34 -

1    challenges. Short product cycles, limited order backlog,

2    aggressive price competition, uneven quarterly revenue

3    patterns, and potential component shortages are all risks

4    that need to be managed. However, we believe that MTI's

5    strong market position and patent portfolio ameliorate

6    the company's risk profile versus other rapidly growing

7    companies.

8    50.    The May 9, 1994 Prudential report contained a MTI

9    quarterly income statement forecast which stated:

| | | | Fiscal 1995 | | Estimate 1995 |
|---|---|---|---|---|---|
| | 6/94 | 9/94 | 12/94 | 3/95 | Year |
| Product revenue | $30,146 | $33,689 | $39,079 | $42,312 | $145,226 |
| Service revenue | 9,750 | 9,500 | 9,750 | 9,900 | 38,900 |
| Total revenues | $39,896 | $43,189 | $48,829 | $52,212 | $184,126 |
| Earnings per share | $.09 | $.13 | $.18 | $.25 | $.65 |

The Prudential report identified one of the sources of this
information as MTI.

51.    The Prudential report was immediately reported over the
Dow Jones News Wire:

Prudential Securities analyst Jamie Kiggen initiated

coverage of MTI Technology Corp. with a "strong buy"

rating.

The data storage system manufacturer went public in

a 5.7 million share offering underwritten by Prudential

Securities and Furman Selz on April 7 at a price of $9.00

a share.

Kiggen said he expect MTI to report net income of 15

cents a share for the fiscal year ended March 31.    He

1    projected earnings of 65 cents for fiscal 1995 and $1.00

2    for 1996.

3    The Prudential analyst said MTI is a leading

4    provider of mid-range fault tolerant storage systems, and

5    the only company to truly offer cross platform solutions.

6    MTI sells into the high-growth RAID market segments, in

7    addition to having a strong patent portfolio, he said.

8    MTI Tech was up 3/8, or 3.9%, at 9 7/8 on Nasdaq

9    volume of 2,800 shares, compared with average daily

10    volume of 216,500. That price exceeds the high of 9 1/2

11    reached on April 11.

12    52. On May 12, 1994, MTI issued a press release reporting its

13    fourth quarter fiscal 1994 and year-end fiscal 1994 ended April 2,

14    1994 results. The release stated:

15    MTI Technology Corp, the Universal Storage Systems

16    Company, a leader in cross-platform high-performance

17    storage solutions, Thursday announced record revenue and

18    increased net income for the current year ended April 2,

19    1994. Total revenue for the current year was $123.5

20    million, an increase of $7.8 million, or 6.7 percent, as

21    compared with the prior year. Net income for the current

22    year was $2.9 million, as compared with a net loss of

23    $5.7 million in the prior year. Income per share for the

24    current year was 18 cents as compared with a loss per

25    share of 45 cents in the prior year. . . .

26    "We are very pleased with the continued acceptance

27    of our high-end StingRay servers and the success in

28    increasing the mix of revenue from sources other than DEC

- 36 -

1     to approximately 12 percent of product revenues in the

2     fourth quarter. We believe our recently announced

3     marketing and technology relationship with IPL Systems

4     Inc. and the Boeing RCAS program will facilitate our

5     strategy of providing cross-platform storage solutions to

6     the broader markets of IBM, open UNIX and DEC systems

7     computing environments," said Steven J. Hamerslag,

8     president and chief executive officer.

9     Total revenue for the fourth quarter of the current

10     year was $37.7 million, an increase of $1.7 million, or

11     4.7 percent over the same period last year. Net income

12     for the current quarter was $1.4 million, a decrease of

13     $.9 million, as compared with the same period last year.

14     Income per share for the current quarter was 9 cents, as

15     compared with 15 cents per share in the fourth quarter

16     last year.

17     53. On May 16, 1994, Prudential issued another research

18   report on MTI. The report forecast fiscal 1995 and 1996 earnings

19   per share of $.65 and $1.00, respectively. The report stated:

20     MTI Technology reported fully diluted earnings per

21     share of $0.07 for their fourth fiscal (March) quarter,

22     after adjusting the number to account for the recent IPO

23     and after backing out $0.01 in net operating loss

24     carryforwards.

25     MTI earned $0.12 a year ago, when they shipped an

26     unusually high number of the (at the time) brand-new

27     Failsafe product. When the Failsafe was rolled out last

28     year, there was significant pentup demand. MTI was

1    initially able to charge a premium, which accounts for

2    the above-trend gross margin and profit numbers.    For

3    fiscal 1994, MTI earned $0.15 versus $0.04 in fiscal

4    1993.

5    **Server Growth Of 125%-Plus and Core Growth Of 40% Helped**

6    **Revenues Hit Our Target.**  Fourth-quarter revenue was on

7    track at $37.7 million versus $36 million a year ago.

8    Storage server revenue was especially strong, up 25%

9    sequentially to $7.1 million.  Sales into markets other

10   than DEC accounted for roughly 12% of total revenue, in

11   line with our expectations.

12        For the full year, revenue came in at $122.9

13   million, up from $115.7 million in fiscal 1993.    The

14   year-ago revenue number had about $30 million of low-

15   margin device-level products that MTI no longer sells;

16   backing out that revenue reveals that MTI's current

17   products are growing at a 40%-plus rate.

18   **Stronger Than Expected Gross Margins Came In 110 Basis**

19   **Points Above Our Model.**  Gross margins came in at 40.8%,

20   110 basis points above our estimate and up 80 basis

21   points sequentially.  Lower component costs and a more

22   favorable product mix accounted for the positive

23   surprise.

24        Increasingly, MTI is selling higher-value-added

25   storage systems with a larger software component.    We

26   expect to see gross margins continue to trend up,

27   although not at the same rate we saw in the fiscal fourth

28   quarter.  Operating margins were 6.1%, slightly below our

- 38 -

1    expectations of 6.5%, primarily due to the addition of

2    operating expenses from the recent SI acquisition.

3    **With a Broad Patent Portfolio, MTI Is Addressing The Most**

4    **Critical Technology Bottleneck Faced By Mid-Range**

5    **Computer Users: The I/O Gap.** Increased computer

6    processing power and memory intensive software appli-

7    cations continue to expand the need for on-line storage

8    and uninterrupted access to data, contributing to a $6

9    billion annual market for mid-range storage systems.

10   Although the performance of existing storage systems

11   has increased, the improvement has lagged the twenty-fold

12   increase in computer processing power that has occurred

13   over the last decade, creating an input/output ("I/O")

14   performance gap between the computer and the data storage

15   device. Seeking maximum performance and fault-tolerance,

16   many users are adopting what are known as RAID (Redundant

17   Arrays of Inexpensive Disks) storage systems; MTI owns

18   the patents on core RAID technologies.

19   **MTI Is Targeting High-Growth Market Segments.** The $6

20   billion market available to MTI is comprised of all mid-

21   range DEC ($1.3 billion), IBM ($2.3 billion), and UNIX

22   ($2.4 billion) storage equipment and software, and the

23   combined growth rate of these markets is expected to be

24   approximately 10%. However, MTI's most advanced products

25   are targeted at market segments growing at rates of 60%-

26   75%, including RAID storage systems, storage management

27   software, and high-performance 8mm tape drives. We

28

- 39 -

1       expect over half of MTI's business to be from customers

2       in these market segments over the coming year.

3       **Which Should Lead to Accelerating Revenue And Earnings**

4       **Growth.** Over the last year, MTI's revenues have advanced

5       from \$115.7 million to \$123.0 million, a seemingly modest

6       6.3%. Obscured by this apparently meager growth rate has

7       been a radical shift away from sales of commodity,

8       device-level products to higher-margin, higher-value-

9       added storage systems.

10       Revenue from these products have shot up from \$65

11       million in fiscal 1993 to an estimated \$90 million in

12       fiscal 1994, or 94% of product revenues. We expect these

13       products to drive 25%-30% top-line growth over the next

14       2-3 years, and earnings per share of \$0.65 in fiscal 1995

15       and \$1.00 in 1996.

16                \*    \*    \*

17       Furthermore, we believe that MTI is better

18       positioned to capture share in the high-growth segments

19       of the storage systems market and has a patent-protected

20       technology advantage over its competitors. Within the

21       next 12-18 months, we believe that MTI's multiple could

22       expand toward its long-term growth rate of 20%-25%,

23       implying a price target in the \$18-\$20 range and

24       appreciation of 103%-125%. We recommend aggressive

25       investors Buy MTIC.

26       54. The May 16, 1994 Prudential report contained a MTI

27   quarterly income statement forecast which stated:

28

| | | Estimated Fiscal 1995 | | | Estimate 1995 |
|---|---|---|---|---|---|
| | 6/94E | 9/94E | 12/94E | 3/95E | Year |
| Product revenue | $30,146 | $33,689 | $39,079 | $42,312 | $145,226 |
| Service revenue | 9,750 | 9,500 | 9,750 | 9,900 | 38,600 |
| Total revenues | $39,896 | $43,189 | $48,829 | $52,212 | $184,126 |
| Net earnings | $ 2,047 | $ 2,833 | $ 4,090 | $ 5,552 | $ 14,522 |
| Earnings per share | $.09 | $.13 | $.18 | $.25 | $.65 |

The report identified one of the sources of this information as MTI.

55.   On May 24, 1994, Prudential issued another report on MTI which again forecasted 1995 and 1996 earnings per share of $.65 and $1.00 per share and stated:

> MTI's High Growth Rate And Sustainable Competitive Advantages Make This An Extremely Undervalued Stock -- Reiterating Strong Buy

> MTI Technology (MTI) sold off sharply last week on fairly light volume, and we can find no fundamental reason for the price drop. The MTI story is one of the strongest in our small-cap universe, and at 11.7 times forward 12-month earnings, it is selling at a steep discount to its comparable universe and to its projected 50%+ growth rate next year.

> MTI is the leading provider of high performance, fault-tolerant storage systems to the mid-range DEC, IBM, and UNIX markets (a $6 billion total market in 1993), and the company is the only vendor selling cross-platform solutions (i.e., MTI's products work with virtually any computer system). Increasingly, computer users are reluctant to be tied to a single processing platform, and

- 41 -

1      MTI's cross-platform design provides customers with a

2      level of flexibility that no competitor can match.

3      Fiscal fourth-quarter earnings of $0.07 pro forma,

4      reported last week, were exactly in line with our

5      estimates, and sales momentum has continued into the June

6      quarter. We are very comfortable with our $0.09 earnings

7      estimate for the current quarter, and we look for a rapid

8      acceleration of earnings as the year unfolds.

9              *   *   *

10      MTI's most advanced products are targeted at market

11      segments growing at rates of 60%-75%, including RAID

12      storage systems, storage management software, and high-

13      performance 8mm tape drives. We expect over half of

14      MTI's business to be from customers in these market

15      segments over the coming year.

16      . . . **That Should Lead To Accelerating Revenue And**

17      **Earnings Growth** . . . Over the past year, MTI's revenues

18      have advanced from $115.7 million to $123.0 million, a

19      seemingly modest 6.3%. A radical shift away from sales

20      of commodity, device-level products has been obscured by

21      this apparently meager growth rate. The focus is now on

22      higher value-added storage systems. Revenue from these

23      products has shot up from $65 million in fiscal 1993 to

24      an estimated $90 million in fiscal 1994, or 94% of

25      product revenues. We expect these products to drive 25%-

26      30% top-line growth over the next two to three years and

27      earnings per share of $0.65 in fiscal 1995 and $1.00 in

28      fiscal 1996.

1    . . . Furthermore, we believe that MTI is better

2    positioned to capture share in the high-growth segments

3    of the storage systems market and has a patent-protected

4    technology advantage over its competitors.

5    56.   The MTI first quarter fiscal 1995 press release and the

6    Prudential reports were all false and misleading.  The true facts

7    which were not disclosed were:

8    (a)   Major customers of MTI's business were delaying

9    and/or deferring new orders and attempting to stretch out and

10   cancel existing orders -- especially FailSafe products -- in

11   amounts that were material to MTI's current and anticipated

12   profits;

13   (b)   In fact, MTI was not pleased with the the continued

14   acceptance of its high-end StringRay servers as that product was

15   not doing well in the marketplace compared to competitive products;

16   (c)   MTI's current products were not growing at a 40%+

17   sales rate, but in fact were growing at a much slower and

18   decreasing rate due to problems in selling both its FailSafe and

19   StingRay product lines;

20   (d)   MTI's competitive position was weakening, especially

21   compared to DEC, and due to severe price-cutting in the domestic

22   market especially, MTI's revenues were growing much less rapidly

23   than earlier forecast and the company was losing money;

24   (e)   It was not true that there was no fundamental reason

25   for the price drop in MTI stock in late May as defendants knew that

26   MTI's business was suffering from the fundamental problems set

27   forth above and that somehow a portion of this information was

28   apparently leaking into the marketplace;

- 43 -

1      (f)   MTI did not have a strong fundamental outlook for
2  revenue and earnings growth because major customers of MTI's
3  business were delaying and/or deferring new orders and attempting
4  to stretch out and cancel existing orders in amounts that were
5  material to MTI's current and anticipated profits;

6      (g)   That, based on information known only to defendants
7  from internal corporate data, they knew that because of the adverse
8  factors listed above which were then affecting MTI's business, MTI
9  would be unable to continue the level of earnings it had achieved
10  in the recent past and were being forecast for it for fiscal 1995-
11  1996, and that, in fact, its earnings would likely suffer a decline
12  in fiscal 1995, if not losses; and

13      (h)   That, based on information known only to defendants
14  from internal corporate data, they did not genuinely believe the
15  earnings forecasts of $.65 for fiscal 1995 and $1.00 for fiscal
16  1996 being made for and on behalf of MTI and were aware that the
17  adverse information known to them seriously undermined and
18  contradicted those forecasts, which therefore had no reasonable
19  basis.

20      57.   Incredibly, on July 6, 1994, MTI revealed that its first
21  quarter fiscal 1995 revenues -- its first complete quarter as a
22  public company -- would be well below the levels previously
23  forecast by it and Prudential due to increased competition and
24  slowing domestic sales.   Upon these revelations, MTI's stock
25  collapsed falling from $6-1/2 on July 5, 1994 to $4 on July 6,
26  1994, on huge volume -- a drop of over 33% in one day.   The stock,
27  which sold to the public at $9 per share in April 1994 and which
28  later advanced to a Class Period high of $10 per share in May, now

- 44 -

1    sells for less than $5 per share. The public has been fleeced
2    while Prudential, Furman Selz and MTI and MTI's controlling
3    shareholders have all profited to the tune of millions.

4        58. The foregoing positive statements about MTI's new
5    products, demand for its existing products, its growing revenues
6    and profits, and the superiority of its existing products and its
7    future business prospects were each false and misleading when
8    issued. They also failed to disclose the adverse facts which then
9    existed and disclosure of which was necessary to make the state-
10   ments made not false and/or misleading as are detailed with respect
11   to each allegedly false and misleading statement.

12       59. The undisclosed adverse information allegedly concealed
13   by defendants during the Class Period is the type of information
14   which, because of SEC regulations, regulations of the national
15   stock exchanges and customary business practice, is expected by
16   investors and securities analysts to be disclosed and is known by
17   corporate officials and their legal and financial advisors to be
18   the type of information which is expected to be and must be
19   disclosed. For example:

20             (a)  Under Item 303 of Regulation S-K, promulgated by the
21   SEC under the Exchange Act, there is a duty to disclose in periodic
22   reports filed with the SEC "known trends or any known demands, com-
23   mitments, events or uncertainties" that are reasonably likely to
24   have a material impact on a company's sales revenues, income or
25   liquidity, or cause previously reported financial information not
26   to be indicative of future operating results. 17 C.F.R.
27   §229.303(a)(1)-(3) and Instruction 3. In addition to the periodic
28   reports required under the Exchange Act, management of a public

1    company has a duty promptly "to make full and prompt announcements

2    of material facts regarding the company's financial condition."

3    Release No. 34-8995 (October 15, 1970) 3 Fed. Sec. L. Rep. (CCH)

4    ¶23,120A, at 17,095, 17 C.F.R. §241.8995.  The SEC has repeatedly

5    stated that the anti-fraud provisions of the federal securities

6    laws, which are intended to ensure that the investing public is

7    provided with "complete and accurate information about companies

8    whose securities are publicly traded," apply to all public state-

9    ments by persons speaking on behalf of publicly traded companies

10    "that can reasonably be expected to reach investors and the trading

11    markets, whoever the intended primary audience."   Release No.

12    33-6504 (January 13, 1984) 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at

13    17,095-3, 17 C.F.R. §241.20560.   The SEC has emphasized that

14    "[i]nvestors have legitimate expectations that public companies are

15    making, and will continue to make, prompt disclosure of significant

16    corporate developments."   Release No. 18271 (November 19, 1981)

17    [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶83,049, at

18    84,618;

19            (b)   Schedule D of the National Association of Securities

20    Dealers ("NASD") Manual, which governs companies whose securities

21    are included in the NASDAQ National Market System, requires a

22    NASDAQ company to "make prompt disclosure to the public through the

23    press of any material information that may affect the value of its

24    securities or influence investors' decisions."   NASD Manual,

25    Schedule D, Part II, §1(c)(13) [¶1803(c)(13)]; and

26            (c)   The New York Stock Exchange ("NYSE") Manual provides

27    that a public company listed on the NYSE "is expected to release

28    quickly to the public any news or information which might reason-

1  ably be expected to materially affect the market for its securi-

2  ties.   This is one of the most important and fundamental purposes

3  of the listing agreement which the company enters into with the

4  Exchange."  NYSE Manual §202.05.

5                    FALSE FINANCIAL STATEMENTS

6      60.   MTI's financial results for the three and nine months

7  ended January 1, 1994, as presented in the Prospectus were false

8  and misleading, as MTI's revenues and earnings per share for these

9  periods were materially overstated.

10     61.   MTI  overstated  earnings  by  failing  to  reserve  for

11 inventory as required by GAAP.  MTI's inventory increased over 26%

12 during the year ended April 3, 1994, as MTI's products were not

13 selling as well as planned and a material amount of its inventory

14 was obsolete.  Yet, MTI took no reserve for obsolete inventory as

15 of January 1, 1994.

16     62.   MTI  also  recognized  revenue  in  violation  of  GAAP  by

17 recognizing revenue on cancelable contracts prior to the cancella-

18 tion  privilege lapsing.  MTI's software license agreements have

19 cancellation clauses and GAAP require that such clauses lapse

20 before revenue can be recognized.  MTI nevertheless recognized the

21 revenues on such contracts.

22     63.   MTI thus overstated its earnings for the three and nine

23 months ended January 1, 1994 by failing to write-down inventories

24 to net realizable value.  GAAP requires that inventory be written

25 down below cost when the utility of the inventory is not as great

26 as the cost.   Typically, a reserve should be taken for obsolete

27

28

1     inventory.[2] MTI took no reserve for obsolescence although a note

2     to MTI's financial statements in the Prospectus represented that

3     such an allowance existed.

4         64. Prior to the Offering, MTI's inventory balance grew

5     disproportionately to its revenues. Inventory increased 18% from

6     $15.1 million at April 3, 1993 to $17.8 million at January 1, 1994.

7     Revenues for the quarter ended January 1, 1994 decreased 11% when

8     compared with the quarter ended April 3, 1993. Despite this large

9     increase in inventory, no reserve for obsolescence was taken. This

10    inflated MTI's earnings per share by a material amount.

11        65. MTI improperly accelerated, $\underline{i}.\underline{e}$., inflated its revenue by

12    recognizing revenue from software licenses prior to those licenses

13    becoming noncancellable. MTI recognized revenue from cancelable

14    contracts net of an allowance for cancellations. This is contrary

15    to GAAP which requires that no revenue be recognized from licenses

16    while a customer still has the right to cancel the license. SOP

17    91-1, ¶53 states in part:

18         "Revenue from cancelable licenses should not be

19        recognized until the cancellation privileges lapse."

20        66. A significant portion of MTI's total revenues are

21    software licenses with cancellation privileges. Since most of

22

23    [2]   Accounting Research Bulletin No. 43, Chapter 4, ¶7 states in part:

24

25       "A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the

26       utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due

27       to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recog-

28       nized as a loss of the current period. This is generally accomplished by stating goods at a lower level commonly designated as market."

- 48 -

1   MTI's sales occurred at the end of a quarter, many of the licenses
2   were still in the cancellation window when the revenue was
3   recognized.

4       67.  MTI's financial statements for the three and nine months
5   ended January 30, 1994, as presented in the Prospectus were false
6   and misleading because:

7           (a)  MTI overstated earnings by failing to reserve for
8   inventory as required by GAAP.  Inventory increased over 26% during
9   the year ended April 3, 1994, MTI's products were not selling as
10  well as planned, and its inventory included material amounts of
11  obsolete and/or unsalable product.  Yet, no reserve for obsolete
12  inventory was taken; and

13          (b)  MTI be recognized revenue in violation of GAAP by
14  recognizing revenue on cancelable contracts prior to the cancella-
15  tion privilege lapsing.  MTI's software license agreements had
16  cancellation clauses and GAAP requires that such clauses lapse
17  before revenue can be recognized.

18                              COUNT I

19                  For Violation Of Section 11 Of The
                    1933 Act Against MTI, The Individual
20                    Defendants, Dillon Read and NFT

21      68.  Plaintiff incorporates by reference ¶¶1-67 above, except
22  allegations of fraud.  This Count is asserted against MTI, the
23  Individual Defendants, Dillon Read and NFT.

24      69.  MTI was the issuer.  The Individual Defendants, NFT and
25  Dillon Read were signatories of the Registration Statement and/or
26  controlling persons of the issuer, MTI.  The defendants other than
27  MTI owed purchasers of the stock the duty to make a reasonable
28  investigation of the statements contained in the Registration

1  Statement and Prospectus to ensure that said statements were true
2  and that there was no omission to state any material fact required
3  to be stated in order to make the statements contained therein not
4  misleading.  Defendants knew or, in the exercise of reasonable
5  care, should have known of the material misstatements and omissions
6  contained in the Registration Statement and Prospectus as set forth
7  herein.  None of those defendants made a reasonable investigation
8  or possessed reasonable grounds for the belief that statements
9  contained in the Registration Statement and Prospectus were true or
10 that there was not any omission of material fact necessary to make
11 the statements made therein not misleading.

12    70.  As signatories of the Registration Statement, directors
13 and/or officers of MTI and controlling persons of the issuer, and
14 as persons consenting to being named as having prepared or
15 certified a part of the Registration Statement, the defendants owed
16 the purchasers of the common stock of MTI, including plaintiff and
17 the Class, the duty to make a reasonable and diligent investigation
18 of the statements contained in the Registration Statement and
19 Prospectus at the time that it became effective, to ensure that
20 said statements were true and that there was no omission to state
21 a material fact required to be stated in order to make the state-
22 ments contained therein not misleading.  Defendants knew or, in the
23 exercise of reasonable care, should have known of the material
24 misstatements and omissions contained in the Registration Statement
25 and Prospectus as set forth herein.  As such, defendants are liable
26 to plaintiff and the Class.

27    71.  None of the defendants made a reasonable investigation or
28 possessed reasonable grounds for the belief that the statements

- 50 -

1     contained in the Registration Statement and Prospectus were true or
2     that there was not any omission of material facts necessary to make
3     the statements made therein not misleading.

4         72.   Defendants issued, caused to be issued and participated
5     in the issuance of materially false and misleading written
6     statements to the investing public which were contained in the
7     Registration Statement and Prospectus, which misrepresented or
8     failed to disclose, inter alia, the facts set forth above.   By
9     reasons of the conduct herein alleged, each defendant violated,
10    and/or controlled a person who violated, §11 of the 1933 Act.   As
11    a direct and proximate result of defendants' wrongful conduct, the
12    market price for MTI common stock was artificially inflated in the
13    Offering, and plaintiff and the Class suffered substantial damages
14    in connection with the purchase of MTI's common stock during the
15    Class Period.

16        73.   Plaintiff and other members of the Class purchased or
17    otherwise acquired their MTI common stock without knowledge of the
18    untruths or omissions alleged herein.   Plaintiff and the other
19    members of the Class were thus damaged by defendants' misconduct
20    and by the material misstatements and omissions of the afore-
21    mentioned Registration Statement.

22        74.   By reason of the conduct herein alleged, each defendant
23    named in this Count violated, and/or controlled a person who
24    violated, §11 of the Securities Act to the damage of plaintiff and
25    the Class.

26        75.   This action was brought within one year after the
27    revelations of July 6, 1994, which led to the discovery of the

28

1    untrue statements and omissions and within three years after MTI

2    stock was offered to the public.

3 <div align="center">COUNT II</div>

4
5
<div align="center">For Violation Of Section 12(2) Of the<br>1933 Act Against Defendants MTI,<br>Noorda, NFT and Hamerslag</div>

6
7      76.   Plaintiff incorporates by reference ¶¶1-75 above, except

8    allegations of fraud.   This Count is asserted against defendants

   MTI, Noorda, NFT and Hamerslag.

9      77.   By means of the Registration Statement and Prospectus,

10    defendants were able to, and did, sell shares of MTI common stock

11    to the named plaintiff and members of the Class.   The underwriter

12    defendants, who orchestrated and controlled the sale and

13    distribution process, provided the necessary expertise, prestige,

14    and marketing and distribution networks, without which the

15    aforesaid shares could not have been sold.

16      78.   Each defendant sued in this Count solicited and/or was a

17    substantial factor in the purchase by plaintiff and the Class of

18    MTI common stock.   Said defendants were motivated, at least in

19    part, by a desire to serve their own financial interests and/or the

20    financial interests of each other defendant.   Said defendants did

21    the following acts in furtherance of their sale of MTI common

22    stock.

23      (a)   The Count II defendants actively and jointly

24    drafted, revised, and approved the Prospectus by which the April 7,

25    1994 Offering was offered to the investing public.   The Prospectus

26    was a "selling document," calculated by these defendants to create

27    interest in MTI common stock and was widely distributed by

28    defendants for that purpose;

1    (b) The Count II defendants jointly finalized the
2    Registration Statement and Prospectus and caused them to become
3    effective as of April 7, 1994. But for these defendants having
4    drafted, filed, and/or signed the Registration Statement and
5    Prospectus, the April 7, 1994 Offering of MTI common stock could
6    not have been made;

7    (c) The Count II defendants conceived and planned the
8    Offering and together jointly orchestrated all activities necessary
9    to effect the sale of these securities to the investing public,
10   including plaintiff and the Class by issuing the securities,
11   promoting the securities, supervising their distribution and
12   ultimate sale to the investing public, undertaking the "Roadshow"
13   and jointly drafting the misleading Prospectus; and

14   (d) The Count II defendants conceived and planned and
15   carried out the "Roadshows" prior to the initial public offering,
16   during which many false statements were made to prospective
17   purchasers of the stock and the purpose and effect of which was to
18   stimulate demand for the stock.

19   79. But for the solicitation by these defendants as set forth
20   above, the April 7, 1994 offering could not and would not have been
21   accomplished. At all times relevant, the Count II defendants knew,
22   or in the exercise of reasonable care should have known, of the
23   misstatements and omissions contained in the Registration Statement
24   and Prospectus as set forth above.

25   80. None of the false and misleading statements and omissions
26   contained in the Registration Statement and Prospectus and
27   described herein were known to the members of the Class at the time
28   they acquired MTI common stock.

- 53 -

1    81.  By reason of the conduct alleged herein, the Count II
2    defendants violated §12(2) of the 1933 Act.  As a direct and
3    proximate result of said defendants' violations of §12(2),
4    plaintiff and the Class sustained substantial damage in connection
5    with the purchases of MTI common stock.

## COUNT III

### For Violation Of Section 15 Of The 1933 Act Against Defendants MTI, Noorda, NFT, Hamerslag, Young and Dillon Read

9    82.  Plaintiff incorporates by reference ¶¶1-81 above, except
10   allegations of fraud.  This Count is asserted against defendants
11   MTI, Noorda, NFT, Hamerslag, Young and Dillon Read.

12   83.  The defendants named in this Count acted as controlling
13   persons of the Company within the meaning of §15 of the 1933 Act.
14   By reason of their senior management positions, stock ownership
15   and/or directorships, as alleged above, the Individual Defendants
16   named in this Count, and NFT and Dillon Read had the power to
17   influence and exercised the same to cause MTI to engage in the
18   unlawful acts and conduct complained of herein.  MTI controlled all
19   the Individual Defendants.

20   84.  By reason of such wrongful conduct, the defendants named
21   in this Count are liable pursuant to §15 of the 1933 Act.  As a
22   direct and proximate result of their wrongful conduct, plaintiff
23   and the other members of the Class suffered damages in connection
24   with their purchases of the Company's common stock during the Class
25   Period.

26

27

28

- 54 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT IV

For Violation Of Section 10(b) Of The
1934 Act And Rule 10b-5 Of The SEC
Against All Defendants

85. Plaintiff incorporates by reference ¶¶1-84 above as if set forth fully herein. This Count is asserted against all defendants.

86. The defendants knew, or were reckless in failing to know, of the material omissions from and misrepresentations contained in the statements as set forth above. Each of the defendants: (a) knew or had access to the material adverse non-public information about MTI's adverse financial outlook and then existing business conditions, which was not disclosed; and (b) directly or indirectly participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about MTI.

87. Throughout the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved releases, statements and reports, referred to above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88. During the Class Period, defendants, individually and via a scheme, directly and indirectly, participated in a course of conduct to conceal material adverse information regarding the then existing business conditions and financial outlook of the Company as specified herein. Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course

- 55 -

1     of conduct as herein alleged to commit a fraud on the integrity of

2     the market for the Company's stock and to maintain artificially

3     high market prices for the common stock of MTI. This included the

4     formulation, making of and/or participation in the making of,

5     untrue statements of material facts and the omission to state

6     material facts necessary in order to make the statements made, in

7     light of the circumstances under which they were made, not

8     misleading, and engaging in acts, practices and a course of conduct

9     which operated as a fraud and deceit upon plaintiff and the Class,

10    all of the above in connection with the purchase of MTI common

11    stock by plaintiff and members of the Class.

12       89. By reason of the conduct alleged herein, defendants know-

13    ingly or recklessly, directly and indirectly, have violated §10(b)

14    of the Exchange Act and Rule 10b-5 promulgated thereunder in that

15    they: (a) employed devices, schemes and artifices to defraud; (b)

16    made untrue statements of material facts or omitted to state

17    material facts necessary in order to make statements made, in light

18    of the circumstances under which they were made, not misleading; or

19    (c) engaged in acts, practices and a course of business that oper-

20    ated as a fraud or deceit upon plaintiff and others similarly

21    situated in connection with their purchases of MTI common stock

22    during the Class Period.

23       90. Plaintiff and the Class have suffered substantial damages

24    in that, in reliance on the integrity of the market, they paid

25    artificially inflated prices for MTI common stock as a result of

26    defendants' violations of §10(b) of the Exchange Act and SEC Rule

27    10b-5. Plaintiff and the Class would not have purchased MTI stock

28    at the prices they paid, or at all, if they had been aware that the

1    market prices had been artificially and falsely inflated by

2    defendants' misleading statements and concealment. At the time of

3    the purchases by plaintiff and the Class of MTI common stock, the

4    fair and true market value of said common stock was substantially

5    less than the prices paid by them.

6                                  COUNT V

7              For Violation Of Section 20(a) Of The 1934
                     Act Against Defendants MTI, Noorda,
8               NFT, Hamerslag, Young and Dillon Read

9
          91.   Plaintiff incorporates by reference ¶¶1-90 above as if
10
     set forth fully herein. This Count is asserted against defendants
11
     MTI, NFT, Noorda, Hamerslag, Young and Dillon Read.
12
          92.   The defendants named in this Count acted as controlling
13
     persons of the Company within the meaning of §20 of the Exchange
14
     Act.   By reason of their positions as senior officers and/or
15
     directors and their shareholdings of MTI, as alleged above, the
16
     defendants named in this Count had the power and authority to cause
17
     the Company to engage in the wrongful conduct complained of herein.
18
     MTI in turn controlled all the Individual Defendants.
19
          93.   By reason of such wrongful conduct, the defendants named
20
     in this Count and MTI are liable pursuant to §20(a) of the Exchange
21
     Act.   As a direct and proximate result of their wrongful conduct,
22
     plaintiff and the other members of the Class suffered damages in
23
     connection with their purchases of the Company's securities during
24
     the Class Period.
25
          WHEREFORE, plaintiff, on behalf of himself and the Class,
26
     prays for judgment as follows:
27

28

                                   - 57 -

1     1. Declaring this action to be a proper class action

2 pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil

3 Procedure on behalf of the Class defined herein;

4     2. Awarding plaintiff and the members of the Class compen-

5 satory damages;

6     3. Awarding plaintiff and the members of the Class pre-

7 judgment and post-judgment interest, as well as their reasonable

8 attorneys' fees, expert witness fees and other costs;

9     4. Extraordinary, equitable and/or injunctive relief as

10 permitted by law, equity and the federal statutory provisions sued

11 hereunder, pursuant to Rules 64, 65 and any appropriate state law

12 remedies, including attaching, impounding, imposing a constructive

13 trust on or otherwise restricting the proceeds of defendants'

14 trading activities or their other assets to assure that plaintiff

15 has an effective remedy; and

16     5. Awarding such other relief as this court may deem just

17 and proper.

18                   JURY DEMAND

19     Plaintiff demands a trial by jury.

20 DATED: July 7, 1994

                                MILBERG WEISS BERSHAD

21                               HYNES & LERACH

                               WILLIAM S. LERACH

22                               ALAN SCHULMAN

23

24

25                               WILLIAM S. LERACH

26                               600 West Broadway, Suite 1800

                               San Diego, CA 92101

27                               Telephone: 619/231-1058

                                 - and -

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILBERG WEISS BERSHAD
  HYNES & LERACH
JEFF S. WESTERMAN
355 South Grand Avenue
Suite 4170
Los Angeles, CA  90071
Telephone:  213/617-9007

LAW OFFICES OF JOSEPH H.
  WEISS
JOSEPH H. WEISS
319 Fifth Avenue
New York, NY  10016
Telephone:  212/532-4171

STULL, STULL & BRODY
ROBERT SUSSER
6 East 45th Street
4th Floor
New York, NY  10017
Telephone:  212/687-7230

Attorneys for Plaintiff

COMPLNTS\MTI2.CPT

- 59 -